STATE of Wisconsin, Plaintiff-Respondent,

v.

Dwight Glen JONES, Defendant-Appellant.

Court of Appeals

*No. 2007AP226–CR. Submitted on briefs October 3, 2007.
—Decided October 23, 2007.*

2007 WI App 248

(Also reported in 742 N.W.2d 341.)

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Ellen Henak*, assistant state public defender of Milwaukee.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *J.B. Van Hollen*, attorney general and *Eileen W. Pray*, assistant attorney general.

Before Curley, P.J., Fine and Kessler, JJ.

¶ 1. FINE, J. Dwight Glen Jones appeals a judgment convicting him of two counts of resisting or obstructing a law-enforcement officer, *see* WIS. STAT. § 946.41(1), one count of operating a motor vehicle without the owner's consent, *see* WIS. STAT. § 943.23(3), one count of theft of movable property worth less than $2,500, *see* WIS. STAT. § 943.20(1)(a), (3)(a), one count of criminal damage to property, *see* WIS. STAT. § 943.01(1), one count of entry into a locked motor vehicle, *see* WIS. STAT. § 943.11, and one count of driving with a revoked operator's license, *see* WIS. STAT. § 343.44(1)(b), all as an habitual criminal, *see* WIS. STAT. § 939.62. He also appeals from the trial court's order denying his motion for postconviction relief. He claims on appeal that he was unable to effectively communicate with his trial lawyer because he, Jones, is severely hearing-impaired. He seeks a new trial. We reverse the trial court's order and remand for an evidentiary hearing on his contentions.

## I.

¶ 2. Jones asserts that he has a severe hearing-impairment. According to a postconviction affidavit submitted by his mother, he has been deaf since birth. Additionally, according to her, he cannot hear without his hearing aids. Jones also submitted a postconviction affidavit asserting that he has no hearing in his right ear, only some twenty-five percent hearing in his left ear, and even with his hearing aids he does not have normal hearing. His affidavit detailed what he contends is his difficulty in communicating:

> I learned sign language in elementary school when he [*sic*] was six or seven years old. I also learned to lip-read. Compared to many other deaf people, I lip-read well but lip-reading is still hard. I cannot see every letter or sound on a speaker's lips. I sometimes miss parts of conversations.
>
> A lot of things effect [*sic*] how easy it is to lip-read in a particular situation. I have a hard time lip-reading when the person speaking is not looking directly at me. It is very difficult when the person is looking down and writing notes. It also is harder when the person has a moustache or a beard, when the person speaks too quickly, or when the lighting is bad. I sometimes have trouble if I am not sure what the subject of the conversation is, when a person uses unfamiliar vocabulary words, when a person uses very long sentences, or when the person begins fidgeting.

Jones's mother's affidavit supported Jones's assessment of his communications difficulties:

> I have never learned sign language. I communicate with Dwight by talking face-to-face to him and using my "loud" voice. I make sure to speak slowly and clearly. Sometimes I will use hand gestures to help him under-

343

stand. If Dwight turns his head or if I turn my head, he cannot read my lips.

A real-time transcription device was used at Jones's preliminary examination, and he was helped at his trial by interpreters for the hearing-impaired. According to an assessment of Jones done by the Dodge Correctional Institution, Jones reads at a "4.4 grade level" even though he was born in 1966.

¶ 3. Jones's trial lawyer was appointed for him by the Wisconsin State Public Defender, and is not employed by that office, but, rather, is in private practice. According to the postconviction affidavits submitted by both Jones and his mother, Jones had trouble lip-reading what his lawyer told him during their meetings in the Milwaukee County jail because the lawyer "spoke too quickly and he always was looking down at his notes." Further, the lawyer "had a mustache which covered his lips and made it hard to see them." Jones added that communication was even more difficult in the holding room in the courthouse, the "bullpen," because the "lighting was bad and we had to try to talk though the door which made it more difficult to see his face." Additionally, "[s]ometimes another inmate would be there and the inmate would be loud or distracting." Jones claims to have asked his lawyer to bring with him "a sign language interpreter" for the preliminary examination and "on at least two other occasions." According to Jones, the lawyer "promised to do so but never did." Jones's mother also averred that she asked the lawyer "several times to get a sign language interpreter for Dwight so Dwight and his attorney could communicate better but he did not do so."

¶ 4. Well before his trial in early February of 2006, Jones was unhappy with what the lawyer was doing for him, and in a handwritten letter dated July 18, 2005,

Jones told the Public Defender's office that the lawyer was "not responding to any of my letters and I have written to him 4–time. I haven't heard from him or saw him since May 19th 05 and that [was] the only time I saw him." (Syntax as in original; some apparent capitalization omitted.) The crux of Jones's complaint in that letter was that the lawyer was not sharing discovery materials with him. Jones also expressed concern that he did not know "why I am being charge[d] with so many different cases." He ended his letter:

> So please understand me because I would like to know what is the situation with my lawyer. I am so tired of sitting here without knowing what I am really here for. I am innocence and I feel that I am sitting here all for nothing without my lawyer talking to me. So please help me!!! I am also deaf.

(In a copy of the letter in the Record, the words "tired of sitting here without knowing" appear to have a line drawn through them.) (Syntax and spelling as in original; some apparent capitalization omitted.)

¶ 5. The Milwaukee office of the State Public Defender responded with, in essence, a so-sad-too-bad letter:

> Dear Ms. [*sic*] Jones:
>
> On July 20, 2005 we received a letter from you. You have expressed concerns about the quality of representation provided by an attorney who was appointed to represent you. The attorney you received is not an employee of the State Public Defender; rather he is a lawyer in private practice that [*sic*] has agreed to take cases from the State Public Defender. The State Public Defender does not directly supervise attorneys who are not its employees. Rather, we will contact your attorney and make him aware of your concerns. It will be up to that attorney to analyze whether your letter to us requires action on his part.

> If your lawyer does not respond to our communication and yours, you may contact us again. In general, however, we cannot get in the middle of your relationship with an attorney.[1]

(Footnote added.)

¶ 6. By handwritten letter dated September 26, 2005, Jones wrote to his lawyer, again complaining that he believed that the lawyer was "not doing your **Job**" because although, according to the letter, the lawyer was supposed to visit Jones on September 7, 2005, he did not. (Capitalization and bolding in original; syntax as in original; some apparent capitalization omitted.) "I have wrote you many time asking you to come visit me but you never respond to any of my letters." (Syntax as in original; some apparent capitalization omitted.) Jones also complained about not seeing the discovery materials, accusing the lawyer of:

> lying to me and hiding a whole lot of information from me and you also make me think you are working with the D.A. too. So therefore, I feel that you are not in my best interest and not doing your job like you suppose to. You not showing me any type of help or concern and if I don't hear from you sometime this week, I will write [the trial court] asking for a new attorney.

(Syntax as in original; some apparent capitalization omitted.)

---

[1] We recognize that the limitation of resources makes monitoring of appointed counsel by the State Public Defender impossible. However, as appointing authority, it is also reasonable to expect a meaningful response to and inquiry regarding complaints about the appointed lawyer's conduct that, if true, could seriously prejudice the client's right to meaningful representation.

¶ 7. Jones sent a handwritten letter dated October 17, 2005, to the trial court, complaining that he did not believe that his lawyer was acting "in my best interest" and accusing the lawyer of "not being truthful with me." He further explained: "I being incarcerated for 6–month and I only saw [the lawyer] one time which was May 10th. I also have written him about 15–letters and he never responded to any of them. I also have wrote the state public Defender office complaining about my situation with him." (Syntax as in original; some apparent capitalization omitted.) He concluded his letter by telling the judge: "I do not want [the lawyer] to represent me anymore and I would like for him to be dismiss from my case." Jones wrote another similar letter, dated October 30, 2005, to the trial court. The only time that Jones referred to his deafness was in his letter to the Public Defender's office.

¶ 8. On October 26, 2005, Jones's lawyer filed a motion to permit him to withdraw as counsel, asserting that he was "the only attorney appointed to represent Mr. Jones during the pendency of this case," and that Jones had asked him to file the motion. On November 30, 2005, the trial court held a hearing on the lawyer's motion. Jones was in court, as were two interpreters for the hearing impaired, one of whom was deaf. The interpreter who could hear explained that she was going to interpret for the deaf interpreter, who would then use sign-language to interpret for Jones. The trial court explained to one of the interpreters that "[o]ne of the things that was said before the case was called is that the defense attorney told me that at least in close proximity he's communicated with the defendant without any interpreter whatsoever." Jones then interjected through the interpreters: "I believe that we did struggle. I think I need an interpreter with my attor-

347

ney." The trial court did not follow up on this assertion, namely that Jones's hearing-impairment might have clouded his ability to communicate effectively with his lawyer, but rather segued into whether Jones might need an interpreter at the trial: "I'm not disputing that he may need an interpreter in court," but was "wondering if this additional step of the deaf interpreter is necessary," saying that that would be "explore[d] for future hearings." At the trial, the trial court also indicated that it had seen the lawyer "and Mr. Jones speaking with each other throughout the length of the trial without any apparent difficulty."

¶ 9. In support of his motion to withdraw, Jones's lawyer told the trial court that "Mr. Jones has sometimes expressed frustration with me," although the lawyer opined that "I believe I've handled his case appropriately." In response to the trial court's question, the lawyer said that he does not "read American Sign, not at all." When the trial court turned to Jones to see what he wanted to say, one of the interpreters interjected: "If you could hold on, Your Honor, we are behind a bit, so although he's attempting to respond, we're not quite caught up." After what the transcript indicates was a "(Pause.)," Jones told the trial court that he wanted "a new lawyer," which the transcript indicates was "(In English)," and which was immediately followed by one of the interpreters, apparently reading what Jones had signed because the transcript indicates that the response was "(Through Interpreter)," "I do want a new attorney." When the trial court asked why he wanted a new lawyer, Jones responded directly (that is, not through the interpreter):

> Because I don't feel he's my best interests. And I wrote him many times because he never came to see me but

one time in seven months, that's it. And I wrote him 16 letters, and he never wrote me back, and I don't want him to be my lawyer.

When one of the interpreters asked the trial court whether it could understand what Jones was saying, the court responded that it could. Jones then added the following through the interpreters: "And I do have more to add. And I am functioning well, understanding through using the interpreters; but I will probably speak using my own voice." When the trial court indicated that it was "very reluctant to allow [the lawyer] to withdraw" because "[t]hat will only delay this case," Jones responded in speech:

> MR. JONES: (In English) We have too many disagreements.
>
> THE COURT: You have too many what?
>
> MR. JONES: (In English) I don't feel comfortable with him. I don't trust him, no, because he's not in my best interests. So I don't want him.

The trial court responded that that was not a sufficient reason: "I haven't heard a reason here." In response to the trial court's question, the lawyer explained that although he had "one main visit" with Jones, he "certainly saw him at the preliminary hearing, and I don't remember if I saw him before that." Jones interjected through one of the interpreters that he did not "think that meeting for four hours was a good meeting," which the trial court did not follow up, but responded, "Well, that's unfortunate."

¶ 10. The trial court denied Jones's lawyer's motion to withdraw, and gave the following two reasons, having earlier, as we have seen, opined that to let Jones's lawyer withdraw would "only delay this case":

- "Defendants are not entitled to counsel of choice."
- "There's nothing here that makes me think that the defendant is being deprived of his 6th Amendment of [*sic*] right to trial [counsel]."

The trial court then made arrangements to have interpreters for the hearing-impaired at Jones's trial, which was scheduled to start on February 6, 2006. Three interpreters for the hearing-impaired appeared at the trial, although only two were used for part of the trial.

¶ 11. With his motion for postconviction relief, Jones submitted scientific literature that indicated that the hearing-impaired can give the impression that they comprehend speech more than they actually do. He also attached a publication given to indigent defendants by the State Public Defender:

**Can I fire my appointed attorney and get a different one?**

Under some circumstances, yes. The client should make a written request to the State Public Defender local office that appointed the attorney. The Public Defender will appoint a second attorney after the court has given permission to the first attorney to withdraw from providing representation in the case. Additional attorneys are appointed only if the court finds that there is good reason to allow the second attorney to withdraw.

¶ 12. In a written decision, the trial court denied Jones's postconviction motion, and gave the following reasons:

- "While Jones now claims that he had difficulty communicating with [his trial lawyer], Jones never once during the course of the November

30, 2005 hearing asserted that that [*sic*] his requests for a change of counsel related to a communication difficulty based on Jones being hard of hearing or deaf."

- That the apparent policy of the State Public Defender to "appoint a second attorney if the trial court has given the first attorney permission to withdraw," was "not determinative."
- Having arranged to have "the interpreters block off time on their calendars" for the February 6, 2006, trial date, and then possibly having to move the trial date would result in "cost and disruption" that was "not insubstantial."
- "On October 17, 2005 (approximately six weeks before the November 30 hearing), this court had advised counsel that it had secured the services of three certified interpreters for the February 6, 2006 trial. It is inconceivable that on November 30, 2005, with the various winter holidays imminent (and the Martin Luther King long weekend also intervening), counsel could have been secured to take this case to trial on February 6 of the following year."
- By February of 2006, the case against Jones was "almost one year old," because the "underlying offenses dated from March and early April, 2005."

## II.

¶ 13. Although an indigent defendant does not have the right to pick his or her trial lawyer, *Mulkovich v. State*, 73 Wis. 2d 464, 474, 243 N.W.2d 198, 203–204 (1976) ("This court has frequently said that, except in

cases of indigency, a defendant may have whatever counsel he chooses to retain and may refuse to accept the services of counsel he does not want."), the indigent defendant *is* entitled to a lawyer with whom he or she can communicate, *State v. Lomax*, 146 Wis. 2d 356, 359, 362, 432 N.W.2d 89, 90, 92 (1988); anything less would make a mockery of the hallowed right to effective legal representation. The ability-to-communicate assessment is left to the reasoned discretion of the trial court. *Id.*, 146 Wis. 2d at 359, 432 N.W.2d at 90.

> In evaluating whether a trial court's denial of a motion for substitution of counsel is an abuse of discretion, a reviewing court must consider a number of factors including: (1) the adequacy of the court's inquiry into the defendant's complaint; (2) the timeliness of the motion; and (3) whether the alleged conflict between the defendant and the attorney was so great that it likely resulted in a total lack of communication that prevented an adequate defense and frustrated a fair presentation of the case.

*Ibid.* Further, the trial court should consider such factors as whether the defendant has changed lawyers before, and whether the requested withdrawal of a lawyer is for a legitimate reason rather than mere delay. *See id.*, 146 Wis. 2d at 360, 432 N.W.2d at 91 (adopting considerations warranting requests for an adjournment). The trial court must, however, make sufficient inquiry to ensure that a defendant is not cemented to a lawyer with whom full and fair communication is impossible; mere conclusions, unless adequately explained, will not fly. *See id.*, 146 Wis. 2d at 361, 432 N.W.2d at 91. Given what the trial court here knew, namely that Jones apparently had profound hearing problems, its inquiry into *why* Jones was frustrated with his lawyer's interaction with him was inadequate

to make an effective record as to why it denied his lawyer's motion to withdraw, especially in light of the lawyer's admission that, apparently, other than first meeting his client at the preliminary examination(!), he only met with Jones once—a meeting that, as noted, Jones told the trial court was not "a good meeting."

¶ 14. As we have seen, the trial court gave two reasons at the end of the hearing on the motion of Jones's lawyer to deny the lawyer's request to be allowed to withdraw: (1) Jones was not entitled to pick his lawyer; and (2) Jones was not being denied his Sixth Amendment right to counsel. In light, however, of the trial court's awareness of Jones's apparent substantial hearing problems and Jones's repeated and non-dilatory pleas to get the lawyer off the case, these reasons are conclusory at best and do not meet the *Lomax*-recognized duty to make sufficient inquiry. *See ibid.* The trial court's explanations for denying Jones's postconviction motion were little better.

¶ 15. First, the trial court faults Jones for not adequately asserting his hearing-impairment at the hearing on the lawyer's motion to withdraw. But Jones was effectively without legal representation on that issue at the hearing, and, indeed, as we have seen, he *did* tell the trial court that he and his lawyer "did struggle" in attempting to talk to one another, saying: "I think I need an interpreter with my attorney." As we have also seen, the trial court did not ask about this to plumb the depth of the "struggle" or why Jones believed he needed an interpreter to effectively communicate with his lawyer.

¶ 16. Second, the trial court made two assumptions that were not supported by anything in the Record: (1) that a new trial date would be needed, even though February 6, 2006, when the trial was

scheduled to start, was more than two months down the road (and, indeed, was more than three months from when Jones wrote his first letter to the trial court seeking to have his lawyer removed); and (2) that if there were a new trial date, it would impose unreasonable "not insubstantial" cost and disruption on the interpreters.

¶ 17. Third, the trial court also assumed, again without support in the Record (for example, by asking the Public Defender's office), that it would be impossible to find a substitute lawyer for the February 6, 2006, trial date.

¶ 18. Fourth, Jones's case was not *that* old and there is nothing in the Record showing that the State would have been prejudiced by any delay, if a delay was, in fact, needed. Indeed, Jones was locked up and so any delay could not, if the State were not prejudiced, benefit him.

¶ 19. Jones submitted substantial scientific and other evidence with his postconviction motion attesting to the difficulties persons like him have in communicating with the non-hearing-impaired, and, also that those who are not hearing-impaired may overestimate their ability to communicate with those who are. He is entitled to try to prove this at what Lomax recommends is the preferred approach—a retrospective evidentiary hearing. *See id.*, 146 Wis. 2d at 365, 432 N.W.2d at 93. We reverse the trial court's order denying without an evidentiary hearing Jones's motion for postconviction relief, and remand this matter to the trial court with instructions to hold that hearing, giving Jones sufficient leeway to prove, by expert testimony if necessary, his contention that he had an irresolvable breakdown in communications with his trial lawyer. If, at the conclusion of that hearing, the trial court determines that

there was a substantial breakdown in communications between Jones and his lawyer, he is to be given a new trial, which is the relief Jones seeks on this appeal.

*By the Court.*—Order reversed and cause remanded with directions.